## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **WILLIAM HALEY,** | : |
| | : |
| **Petitioner,** | : |
| | : |
| **v.** | : **3:12-CV-00775** |
| | : **(JUDGE MARIANI)** |
| **RONNIE HOLT, et al.,** | : |
| | : |
| **Respondents.** | : |

### MEMORANDUM OPINION

#### I. INTRODUCTION

Petitioner William Haley ("Petitioner" or "Haley"), an inmate currently in the custody

of the Federal Bureau of Prisons, initiated the above-captioned action by filing a Petition for

Writ of Habeas Corpus. (Doc. 1). Petitioner asserts Respondents violated the *Ex Post Facto*

Clause of the Constitution by granting him parole in 2010 rather than 2001, when, according

to Haley, he was presumptively suitable for parole. (Doc. 22 at 4-5). Petitioner argues

Respondents inappropriately applied the parole guidelines promulgated by the United

States Parole Commission ("USPC" or "Commission") in 2000 ("2000 Guidelines"), 28

C.F.R. § 2.80 (2001), 65 Fed. Reg. 70663 (Nov. 27, 2000), rather than the regulations

promulgated by the District of Columbia Board of Parole ("D.C. Parole Board"), D.C. Mun.

Regs. tit. 28, §§ 100 *et seq.* (1987) (repealed Aug. 5, 2000), in 1987 ("1987 Regulations").

(Doc. 22 at 4-5).

Presently before the Court is Magistrate Judge Carlson's Report and

Recommendation ("R&R"), recommending that Haley's Petition be denied. (Doc. 48). Haley

has filed Objections (Doc. 53), the parties have briefed the issues (Docs. 54-56), and the

matter is now ripe for disposition. For the reasons set forth below, Haley's Petition will be

denied.

## II. BACKGROUND

### A. Parole Practices for D.C. Offenders

Because Haley's claim is predicated upon differences between the 1987 Regulations

and the 2000 Guidelines, it is appropriate for the Court to begin with a discussion of those

parole regimes. On August 5, 1998, jurisdiction over parole decisions for D.C. offenders was

transferred from the D.C. Parole Board, which had used its 1987 Regulations, to the USPC.

*Sellmon v. Reilly*, 551 F. Supp. 2d 66, 69 (D.D.C. 2008) (citing D.C. Mun. Regs. tit. 28, §§

100 *et seq.* (1987) (repealed Aug. 5, 2000)); *see also Puifory v. Reilly*, 2009 WL 839354, at

*2 (M.D. Pa. 2009) (Vanaskie, J.). The National Capital Revitalization and Self-Government

Improvement Act of 1997 ("Revitalization Act"), Pub. L. No. 105-33, § 11231(a)(1), 111 Stat.

712, 734-37 (codified at D.C. Code § 24-131 (2001)), abolished the D.C. Parole Board but

required the USPC to continue to follow D.C. parole law and regulations. *Puifory*, 2009 WL

839354, at *2. However, the Revitalization Act accorded the USPC the "'exclusive authority

to amend or supplement any regulation interpreting or implementing' D.C. parole laws." *Id*.

(quoting D.C. Code § 24-131). "Between 1998 and 2000, the USPC drafted new parole

2

regulations and guidelines . . . that it applied to any offender who received an initial parole hearing after August 5, 1998." *Sellmon*, 551 F. Supp. 2d at 72.

In 2008, the United States District Court for the District of Columbia ("D.C. Court") held in *Sellmon v. Reilly* "that application of the USPC's regulations to those D.C. offenders who had committed their offenses during the time period that the D.C. Board's guidelines were in effect (i.e., March 4, 1985 to August 4, 1998), violated the Ex Post Facto clause of the U.S. Constitution." *Marshall v. Reiley*, 2014 WL 6066163, at *2 (M.D. Pa. 2014) (citing *Sellmon*, 551 F.Supp.2d 66). In response, the USPC issued the *"Sellmon* Rule" which required the USPC "to provide new parole hearings for D.C. Code offenders who had committed their crimes between March 4, 1985 and August 4, 1998, and to use the 1987 guidelines of the D.C. Board in conducting those parole hearings." *Id*. (citing 74 Fed. Reg. 34688 (July 17, 2009)).

### 1. *1987 Regulations*

In *Sellmon*, the D.C. Court discussed the 1987 Regulations and 2000 Guidelines in considerable detail. 551 F. Supp. 2d at 68-73, 87-89. Under the 1987 Regulations, a D.C. Code offender became eligible for parole after serving his minimum sentence. *Id*. at 69. The 1987 Regulations drew a distinction between parole eligibility and suitability. *Id*. An inmate would first have to become *eligible* for parole before the D.C. Parole Board would consider whether he was *suitable* for parole. *Id*. An offender's parole eligibility was prescribed by statute. *Id*. at 69 n.4 (citing *Cosgrove v. Thornburgh*, 703 F. Supp. 995, 997 (D.D.C. 1988)).

3

An offender's suitability, in contrast, was determined by the D.C. Parole Board in accordance with the 1987 Regulations. *Id.*

The 1987 Regulations erected an analytical framework that relied on four factors, two pre-incarceration factors, the degree and type of risk posed by an offender, and two post-incarceration factors, an offender's institutional adjustment and program participation. *Id.* at 70-71. The first and "primary" factor under the 1987 Regulations was the degree of risk an offender posed. *Id.* at 70. The D.C. Parole Board calculated this category based on a "Salient Factor Score ['SFS'], an actuarial risk assessment device that relies exclusively on information known at the time of incarceration." *Id.* (internal quotation marks omitted). *Sellmon* explained how an offender's SFS was calculated under the 1987 Regulations.

> [T]he Board considered six pre-incarceration factors: (1) prior convictions and adjudications; (2) prior commitments of more than 30 days; (3) age at the commission of current offense; (4) recent commitment-free period; (5) status of prisoner at time of current offense; and (6) history of heroin or opiate dependence. The SFS placed the candidate into one of four risk categories (10-9 = low risk, 8-6 = fair risk, 5-4 = moderate risk, or 3-0 = high risk) from which the Board would determine a baseline number of points ("base point score") that provided 0 for low risk, 1 for fair risk, 2 for moderate risk, and 3 for high risk.

*Id.* (internal citations omitted).

After calculating an offender's base point score, the D.C. Parole Board would adjust it using the remaining three factors to arrive at a total point score. *Id.* The second factor, the type of risk posed by the offender, permitted the Board to increase a total point score by a maximum of one point if the parole candidate's current offense involved violence, weapons,

4

or drug trafficking. *Id.* The third factor, the offender's institutional adjustment, was also an aggravating factor. *Id.* The Board could add one point to an offender's total point score for "negative institutional behavior" if it found that the inmate's institutional infractions adversely impacted his suitability for parole. *Id.* at 70-71. The fourth and final factor, an offender's program participation, was a mitigating factor that enabled offenders to receive a one-point reduction for "sustained achievement in the area of prison programs, industries, or work assignments while under confinement for the current offense." *Id.*; D.C. Mun. Reg. § 204.18(i).

After the D.C. Parole Board combined all of these factors, the total point score indicated whether an inmate was suitable for parole. *Sellmon*, 551 F. Supp. 2d at 71. At an initial hearing, a total point score of zero, one, or two created a presumption of suitability for parole, while a score of three or higher resulted in a presumption against parole. D.C. Mun. Reg. § 204.19(a)-(d)). At a reconsideration hearing, the 1987 Regulations provided that parole should ordinarily be granted for a total point score of zero to three but denied for a score of four or five. *Id.* at § 204.21.

Section 204.22 of the 1987 Regulations permitted the D.C. Parole Board, "in unusual circumstances," to "depart from the strict application" of the Regulations.

> In Appendix 2-1 of the 1987 Regulations, the D.C. Parole Board listed six pre-incarceration factors that, if applicable, demonstrated that the candidate was a greater risk for parole than reflected by his or her total point score: (1) the offender repeatedly failed under parole supervision; (2) the current offense involved ongoing criminal behavior; (3) the offender had a lengthy history of criminally related alcohol abuse; (4) the offender had a history of repetitive

5

sophisticated criminal behavior; (5) the offender had an unusually serious prior record of at least five felony convictions; or (6) the offender's crime involved unusual cruelty to victims.

*Sellmon*, 551 F. Supp. 2d at 71.

### 2. *1991 Policy Guideline*

As *Sellmon* explained, the D.C. Parole Board adopted a policy guideline in 1991 ("1991 Policy Guideline") to elaborate on the terms used in the 1987 Regulations. *Id.* The 1991 Policy Guideline defined "negative institutional behavior" in the context of initial parole hearings and reconsideration hearings. (Pet'r's Ex. 2, Doc. 22-4, at 2). For initial hearings, negative institutional behavior was defined as: (1) "[o]ne Class I Offense for murder, manslaughter, kidnapping, armed robbery or first degree burglary at any time during the minimum sentence;" or (2) "[o]ne Class I Offense . . . during the 12 months preceding the hearing OR during the last half of the minimum sentence up to a period of three years, whichever is longer; OR (3) [t]wo Class II Offenses . . . during the 12 months preceding the hearing or during the last half of the minimum sentence up to a period of three years, whichever is longer." (*Id.*). For reconsideration hearings, negative institutional behavior was measured "since the preceding release consideration on the sentence[.]" (*Id.* (emphasis in original)).

The 1991 Policy Guideline also defined "sustained program or work assignment achievement." (*Id.* at 3). During initial parole hearings, an offender would be found to have "sustained program or work assignment achievement" upon:

6

(1) Successful completion of one or two educational or vocational programs, or program levels, each of which enabled the offender to develop an academic or job-related skill, OR enabled the offender to progress to a higher level of difficulty or skill in the program area; OR

(2) Award of a GED . . . OR

(3) Successful completion of the requirements and award of an Associate's or Bachelor's degree; OR

(4) Successful completion of one or more short-term special needs programs, such as drug treatment or psychological counseling to address the offender's identified problems . . . OR

(5) Satisfactory participation in one or more work details for at least one-third of the period of incarceration.

(*Id.*).

In the context of a reconsideration hearing, offenders would be found to have "sustained program or work assignment achievement" based on their achievements since their last parole hearing. (*Id.*).

Lastly, the 1991 Policy Guideline included among its list of definitions each of the 1987 Regulations' "unusual circumstances" that could warrant departure and parole denial despite a favorable total point score. (*Id.* at 6-9). The 1991 Policy Guideline

also added and defined three additional "unusual circumstances" that would justify a departure from the action indicated by the total base point score: (1) repeated or extremely serious negative institutional behavior; (2) lengthy history of criminally-related substance abuse; and (3) absence of community resources which ensure the safety of the community.

*Sellmon*, 551 F. Supp. 2d at 72.

For a reconsideration hearing, the 1991 Policy Guideline defined "repeated or extremely serious negative institutional behavior" based on "offenses <u>occurring since the preceding release consideration</u>[.]" (Pet'r's Ex. 2 at 7-8 (emphasis in original)).

### 3. *2000 Guidelines*

Before jurisdiction over D.C. offenders was transferred to the USPC, the USPC incorporated a revised version of the 1987 Regulations into the Federal Register. *See* 63 Fed. Reg. 39172 (July 21, 1998). These revised guidelines were interim regulations ("1998 Interim Regulations") that were applied, with subsequent amendment,[1] until the USPC established its final rules under the 2000 Guidelines. *See id*.; 28 C.F.R. § 2.80 (2001), *originally published at* 65 Fed. Reg. 70663 (Nov. 27, 2000). The 2000 Guidelines applied to "any rehearing for an adult [D.C. offender] who was given an initial hearing on or after August 5, 1998, but before December 4, 2000[.]" § 2.80(a).

As *Sellmon* demonstrated, the 2000 Guidelines share several similarities with the 1987 Regulations. 551 F. Supp. 2d at 72-73. Like "the 1987 Regulations, the 2000 Guidelines use a point score system to determine whether a candidate is presumptively suitable for parole." *Id*. at 73. The 2000 Guidelines similarly begin "with a calculation of the [SFS], which assesses the degree of risk that a parole candidate will become a recidivist." *Id*. (citing § 2.80(c); § 2.20). Under the 2000 Guidelines, like the 1987 Regulations, the USPC assesses the type of risk posed by an offender by considering the offender's history

---

[1] The 1998 Interim Regulations were amended on October 26, 1998, 63 Fed. Reg. 57060, and February 4, 1999, 64 Fed. Reg. 5611, before being republished in full on April 13, 2000, 65 Fed. Reg. 19996, with an ongoing request of public comment. *See* 65 Fed. Reg. 45885 (July 26, 2000).

of violence, use of weapons, and whether the victim died as a result of the inmate's offense. § 2.80(f). Under the 2000 Guidelines, the degree and type of risk posed by an offender determines the base point score, which is then "converted into a 'base guideline range' of months that are added to the parolee's minimum sentence imposed by the court." *Id.* (citing § 2.80(h)).

Like the 1987 Regulations, the 2000 Guidelines also consider negative institutional behavior and program achievement. *Id.* (citing §§ 2.80(j) & (k)). However, unlike the 1987 Regulations, these factors add and subtract months to a "'total guideline range,' which is 'the amount of time an offender may expect to serve with continued good conduct and ordinary program achievement.'" *Id.* (brackets omitted) (quoting 65 Fed. Reg. 70663, 70664 (Nov. 27, 2000)). Under the 2000 Guidelines, a parole candidate is presumptively unsuitable for parole until he has served a period of imprisonment equal to the bottom of his total guideline range. *Id.* (citing §§ 2.80(h), (i) & (l)).

Finally, the 2000 Guidelines, like the 1987 Regulations, allow the USPC to deny parole "notwithstanding the guidelines" in "unusual circumstances." *Id.*; § 2.80(n)(1). Although the 2000 Guidelines provide examples of "unusual circumstances," they do not limit the discretion of the USPC. § 2.80(n)(1) & (2). They instead state that the USPC may depart for any reason "not fully taken into account in the guidelines" that is "relevant to the grant or denial of parole." *Id.* at § 2.80(n)(1).

9

## B. Haley's Incarceration and Parole Record

On August 1, 1994, the District of Columbia Superior Court sentenced Haley to five

to thirty years of imprisonment for possession of a firearm during a crime of violence and

attempted armed robbery. (Pet'r's Sentencing Data, Doc. 11-1, Ex. 1). While serving this

sentence, Petitioner stabbed another inmate and was convicted of second-degree murder.

(Id.; Prehearing Mem., Doc. 11-1, Ex. 13). On April 21, 1997, the United States District

Court for the Eastern District of Virginia sentenced Haley to an additional term of

imprisonment of 145 months to be served upon the completion of his first sentence. (Id.).

On January 7, 1999, the USPC conducted Haley's initial parole hearing. (Hr'g

Summ., Doc. 11-1, Ex. 2). The USPC applied 1998 Interim Regulations, 28 C.F.R. § 2.80

(1999), and assessed Haley's total point score to be nine. (Jan. 7, 1999 Hr'g Summ. at 1,

4). Since his total point score was higher than two, the USPC denied Petitioner parole. (Feb.

4, 1999 Notice of Action, Doc. 11-1, Ex. 3).

Haley's first rehearing was held on March 21, 2001. (Hr'g Summ., Doc. 11-1, Ex. 4,

at 1). The USPC reduced his total point score from nine to eight due to "ordinary program

achievement." (Id.).[2] Although Petitioner would have been presumptive suitable for parole at

this time had the USPC applied 1987 Regulations (see infra Section IV; May 10, 2010

Mem., Doc. 11-1, Ex. 16), the USPC denied his parole request. (May 4, 2001 Notice of

_____

[2] While it is clear that the USPC did not apply the 1987 Regulations during Haley's first
reconsideration hearing, it is unclear what guidelines were applied. It appears that the USPC applied the
1998 Interim Regulations; however, the hearing summary does not detail the Hearing Examiner's total point
calculation. (Mar. 21, 2001, Hr'g Summ., Doc. 11-1, Ex. 4). Instead, it refers to a prehearing assessment,
dated February 26, 2001, which was not included in the record. (Id. at 1).

10

Action, Doc. 11-1, Ex. 5). Between 2002 and 2009, Haley received three subsequent reconsideration hearings. (Doc. 11-1, Exs. 6-12). During each rehearing, the USPC applied the 2000 Guidelines and denied Petitioner parole.

In 2009, the USPC promulgated the *Sellmon* Rule, which required the USPC to apply the 1987 Regulations to D.C. Code offenders who committed an offense between March 4, 1985 and August 4, 1998. 74 Fed. Reg. 34688 (July 17, 2009) (interim rule, effective August 17, 2009); 74 Fed. Reg. 58540 (November 13, 2009) (final rule). Since Haley committed his offense on August 1, 1994, he received a *Sellmon* reconsideration hearing on December 10, 2009. (Prehr'g Summ., Doc. 11-1, Ex. 13; Hr'g Summ., Doc. 11-1, Ex. 14)). The Hearing Examiner reassessed Petitioner's total point score for each of his prior parole hearings. (Dec. 10, 2009 Hr'g Summ. at 2-3). Based on these scores, the Hearing Examiner determined that Haley's total point score at that time was four. (*Id.* at 3). As a result, the USPC again denied Petitioner parole. (Feb. 13, 2010 Notice of Action, Doc. 11-1, Ex. 15).

The USPC's summary of the December 10, 2009 hearing reflects that Haley's counsel contended that he was entitled to parole *nunc pro tunc* since he would have been presumptively suitable for parole in 2001. (Dec. 10, 2009 Hr'g Summ. at 3). The Hearing Examiner specifically rejected this argument, stating that even if he had recommended parole, the Hearing Examiner "would have recommended a parole to the consecutive

11

sentence only." (*Id.*). On January 8, 2010, Haley's counsel wrote a letter to the USPC,

asserting:

> Mr. Haley should have received a rehearing score of two (2) at the remedial parole hearing conducted on December [10], 2009 by Hearing Examiner Joseph M. Pacholski. Mr. Haley is therefore presumptively suitable for parole at this time, as he has been since his second hearing in 2001. Thus, we request that the Commission decline to adopt the recommendation of Mr. Pacholski, and instead grant Mr. Haley parole to his federal detainer at this time. Furthermore, we request that the Commission exercise its discretion to issue Mr. Haley's parole certificate *nunc pro tunc*, dated to March 21, 2001, the date on which Mr. Haley would first have been presumptively suitable for parole under the correct guideline, because this is the only adequate remedy for the ex post facto violation in his case.

(Doc. 22-6, Ex. 4, at 1).

On January 25, 2010, an Executive Reviewer provided comments on Hearing

Examiner Pacholski's recommendation. (Dec. 10, 2009 Hr'g Summ. at 3-4). The Executive

Reviewer indicated that the USPC received and considered the January 8, 2010 letter from

Haley's counsel. (*Id.* at 3). The Executive Reviewer nevertheless "agree[d] with Examiner

Pacholski's point score and his recommendation to deny parole[.]" (*Id.*).

According to a USPC memorandum, Haley's counsel sent the USPC another letter

on April 5, 2010 requesting that it reopen Petitioner's case. (May 10, 2010 Mem., Doc. 11-1,

Ex. 16). Haley's attorney asserted that the USPC inappropriately applied the 2000

Guidelines with regard to Petitioner's program participation and that Haley was entitled to a

one-point reduction under the 1987 Regulations at his initial hearing. (*Id.*). Haley had

"submitted an official record showing he passed the GED test in August 1996," prior to his

1999 initial hearing. (*Id.*). The USPC's general counsel reviewed the December 10, 2009

parole decision and determined that there was "some merit" to Haley's claim that he "should

have received a one-point reduction in his grid score at the 1999 initial hearing." (*Id.*).

Accordingly, the USPC's general counsel recommended that Petitioner's case be reopened.

(*Id.*). On May 18, 2010, the USPC issued a Notice of Action ordering a "special

reconsideration hearing" to "re-evaluate the case under the 1987 D.C. Board guidelines with

the information that the prisoner completed the GED requirements in August 1996." (Doc.

11-1, Ex. 17).

The USPC conducted the rehearing on June 22, 2010. (Hr'g Summ., Doc. 11-1, Ex.

18). The hearing summary indicates that the "hearing was limited in scope to discuss the

points awarded at the previous hearings." (Doc. 11-1, Ex. 18, at 1). The Hearing Examiner

noted, "One of the primary purposes of today's hearing was to determine whether there

would be program achievement points awarded at the Initial Hearing [on] 1/7/1999." (*Id.* at

2). Because the Hearing Examiner found that Haley received his GED in prison prior to his

initial hearing, she concluded that he was entitled to a one-point reduction for program

achievement under the 1987 Regulations. (*Id.*). As a result, the Hearing Examiner assessed

Haley's total point score to be two, which made him presumptively suitable for parole. (*Id.* at

3).

She then discussed Petitioner's history of institutional infractions but stated she

nonetheless believed "a positive outcome from this parole hearing is justified." (*Id.*). In

13

reaching this conclusion, the Hearing Examiner discussed Haley's program participation and the fact that most of his disciplinary infractions occurred prior to 2007. (*Id*.). "Finally," she noted, "the subject will not [be] release[d] to the community, but instead has a consecutive sentence of 145 months. It was clearly explained to Mr. Haley that, if paroled, he would still be held accountable for any serious infractions he receives while incarcerated on the 145[-month] sentence." (*Id*.).

Rather than recommend immediate parole, the Hearing Examiner recommended that Haley be paroled after serving 198 months, two and a half months after the hearing. (*Id*.). Petitioner was paroled on September 6, 2010 and began to serve his 145-month consecutive sentence. (July 27, 2010 Notice of Action, Doc. 11-1, Ex. 19; Certificate of Parole, Doc. 11-1, Ex. 20). There is no evidence of record that indicates that Haley requested *nunc pro tunc* relief during the June 22, 2010 hearing or in his request to reopen. The parties did not include a copy of the April 5, 2010 request to reopen for the Court's review, and the summary of the June 22, 2010 hearing does not indicate that Petitioner argued for *nunc pro tunc* relief during the hearing.

On September 15, 2011, over a year after Haley was paroled to begin his second sentence, his counsel contacted the USPC requesting that it "either issue a revised Notice of Action and enter a *nunc pro tunc* [parole] date or order a special reconsideration hearing to further consider what the Commission would have done at Mr. Haley's prior hearings had the correct guidelines been applied." (Pet'r's Ex. 5, Doc. 22-7, at 2). In renewing his request

14

for *nunc pro tunc* relief, Petitioner sought to be paroled effective 2001. (*Id*.). The USPC

responded, in a letter dated September 29, 2011,

> The Parole Commission received your letter on behalf of William Haley to
> Chairmen Fulwood and Rockne Chickinell requesting an earlier parole date
> (*nunc pro tunc*) or, in the alternative, a special reconsideration hearing. The
> letter has been treated as a request to reopen the case. This letter is inform
> you that the Commission has reviewed the case, and decided not to reopen.

(Pet'r's Ex. 6, Doc. 22-8).

After the USPC declined to reopen his case, Haley filed a Petition for Writ of Habeas

Corpus. (Doc. 1). Petitioner asserts that the USPC's failure to apply the 1987 Regulations

during his 2001 reconsideration hearing constitutes an *ex post facto* violation. (Doc. 22 at

7). Haley further argues that the only appropriate remedies for the alleged violation is either

his immediate release from custody or remand to the USPC to conduct a reconsideration

hearing. (*Id*. at 19).

## III. STANDARDS OF REVIEW

### A. Magistrate Judge's Report & Recommendation

When a party files objections to a magistrate judge's report and recommendation,

the district court must perform a *de novo* review of the contested portions of the report. 28

U.S.C. § 636(b)(1)(C). The Federal Magistrates Act does not require a district court to

review a report and recommendation in the absence of objections. *Henderson v. Carlson*,

812 F.2d 874, 878 (3d Cir. 1987). However, the Third Circuit has held that courts should

"afford some level of review to dispositive legal issues raised by the report." *Id*. "When no

15

timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Cruz v. Chater*, 990 F. Supp. 375, 378 (M.D. Pa. 1998) (quoting Fed. R. Civ. P. 72(b) 1983 advisory committee notes).

## B. USPC Decisions

"[A] court's role in reviewing decisions by the Parole Commission on an application for a writ of habeas corpus is limited." *Furnari v. Warden, Allenwood Fed. Corr. Inst.*, 218 F.3d 250, 254 (3d Cir. 2000). "The function of judicial review on a petition for writ of habeas corpus in the parole context is to determine whether the Commission abused its discretion." *Marshall*, 2014 WL 6066163, at *2 (citing *Furnari*, 218 F.3d at 254). "The court is not empowered to substitute its judgment for that of the Commission in evaluating a habeas petitioner's claims, unless the Commission's exercise of discretion represents an egregious departure from rational decision-making." *Id.* "The appropriate standard of review of the Commission's findings of fact 'is not whether the Commission's decision is supported by the preponderance of the evidence, or even by substantial evidence; the inquiry is only whether there is a rational basis in the record for the Commission's conclusions embodied in its statement of reasons.'" *Furnari*, 218 F.3d at 254 (brackets omitted) (quoting *Zannino v. Arnold*, 531 F.2d 687, 691 (3d Cir. 1976)). Courts consider "whether the Commission 'has followed criteria appropriate, rational and consistent' with its enabling statutes so that its 'decision is not arbitrary and capricious, nor based on impermissible considerations.'" *Id.* (quoting *Zannino*, 531 F.2d at 690).

## IV. ANALYSIS

"The Constitution prohibits both federal and state governments from enacting any '*ex post facto* Law.'" *Peugh v. United States*, 133 S. Ct. 2072, 2081, 186 L. Ed. 2d 84 (2013) (quoting U.S. Const. art. I, § 9, cl.; art. I, § 10, cl. 1). "One function of the *Ex Post Facto* Clause is to bar enactments which, by retroactive operation, increase the punishment for a crime after its commission." *Garner v. Jones*, 529 U.S. 244, 249, 120 S. Ct. 1362, 1367, 146 L. Ed. 2d 236 (2000). "Retroactive changes in laws governing parole of prisoners, in some instances, may be violative of this precept." *Id.* at 250. "Whether retroactive application of a particular change in parole law respects the prohibition on *ex post facto* legislation is often a question of particular difficulty when the discretion vested in a parole board is taken into account." *Id.* "But the mere fact that parole decisions are discretionary is not, in and of itself, sufficient to immunize a retroactive change in parole guidelines from ex post facto review." *Puifory*, 2009 WL 839354, at *5 (citing *Garner*, 529 U.S. at 250).

"The ex post facto inquiry has two prongs: (1) whether there was a change in the law or policy which has been given retrospective effect, and (2) whether the offender was disadvantaged by the change." *Richardson v. Pennsylvania Bd. of Prob. & Parole*, 423 F.3d 282, 287-88 (3d Cir. 2005). With regard to the second prong, the "touchstone" of the "inquiry is whether a given change in law presents a 'sufficient risk of increasing the measure of punishment attached to the covered crimes.'" *Peugh*, 133 S. Ct. at 2082 (quoting *Garner*, 529 U.S. at 250). A "speculative and attenuated possibility of . . . increasing the measure of

punishment" is insufficient. *California Dep't of Corr. v. Morales*, 514 U.S. 499, 509, 115 S.
Ct. 1597, 1597, 131 L. Ed. 2d 588 (1995). "The question when a change in law creates such
a risk is 'a matter of degree'; the test cannot be reduced to a 'single formula.'" *Peugh*, 133
S. Ct. at 2082 (quoting *Morales*, 514 U.S. at 509).

"[I]t is not sufficient for a prisoner to show that [a parole board] relied on a new law or
policy." *Richardson*, 423 F.3d at 292. Instead, the prisoner must also adduce "some
evidence" to show that the law or policy "*as applied to his own sentence* . . . created a
significant risk of increasing his punishment." *Id.*; *Garner*, 529 U.S. at 255 (emphasis
added). However, a prisoner need not demonstrate that he would have been paroled "but
for" the new law or policy. *Richardson*, 423 F.3d at 292 n. 5 (noting that a "but for" standard
"has no basis in federal ex post facto law").

Here, Magistrate Judge Carlson found that Haley met the first prong of the *ex post
facto* analysis (Doc. 48 at 14-15) but did not reach the question of whether Petitioner met
the second prong. (*Id.* at 15-19). Instead, he concluded that even if an *ex post facto*
violation occurred, "Haley has already received the relief to which he might have been
entitled when the Commission reconsidered his case in 2010 and he was released." (*Id.* at
18). As Magistrate Judge Carlson noted, "the undisputed fact is that in June 2010, the
Commission did reconsider Haley for parole based upon the 1987 Guidelines, and following
that review determined that Haley should be paroled – not immediately – but in September
2010 to begin serving his 145-month sentence for the murder conviction." (*Id.*).

18

Petitioner filed objections to the R&R (Doc. 53) and argues that Magistrate Judge Carlson erred (1) in failing to find that the USPC violated the *Ex Post Facto* Clause and (2) in finding that Haley is not entitled to further relief. (Doc. 54 at 2). There is no objection to Magistrate Judge Carlson's findings regarding the first prong of the *ex post facto* analysis. Accordingly, the Court reviews Magistrate Judge Carlson's analysis under the first prong for clear error.

Magistrate Judge Carlson was correct in finding that the 2000 Guidelines are more stringent than the 1987 Regulations, which were in effect when Haley committed his crime. *See Sellmon*, 551 F. Supp. 2d at 87-89 (detailing the differences between the 2000 Guidelines and the 1987 Regulations and concluding "that there are facial differences between them that could give rise to an ex post facto violation in individual cases"); *Puifory*, 2009 WL 839354, at *2, 7 (comparing 1987 Regulations and the 2000 Guidelines and observing that the plaintiff was "confronting a parole regime that is much different than that which prevailed at the time he committed his offense"); *see also Brown v. Williamson*, 314 F. App'x 492, 493-94, 496-498 (3d Cir. 2009) (outlining the differences between D.C. guidelines from 1978, which the 1987 Regulations codified with "no significant substantive changes," and the 2000 Guidelines and finding that those differences "indicate that retroactive application of the current parole guidelines might pose a significant risk of prolonging [the plaintiff's] incarceration").

Whereas the 1987 Regulations added a maximum of one "point to a candidate's SFS

if his current or past offenses involved violence, weapons, and/or drug trafficking, the 2000

Guidelines treat a candidate's history of violence, use of a weapon, and the death of the

victim as separate factors for which the USPC may award up to 7 points" to the candidate's

base point score. *Sellmon*, 551 F. Supp. 2d at 87. Second, "the 2000 Guidelines penalize

an offender more harshly for negative institutional behavior." *Id*.

> Under the 1987 Guidelines, an offender could have one additional point
> added to his SFS for disciplinary violations, which, depending on the
> offender's record, might not have any impact on his eligibility for parole.
> Under the 2000 Guidelines, institutional disciplinary reports are used to add a
> range of months to the period that a candidate must serve to be presumed
> eligible for parole.

*Id*.

Third, the 2000 Guidelines limit the benefit an offender can receive for program

participation. *Id*. at 88. Under the 1987 Regulations, an offender with "sustained

achievement in the area of prison programs, industries, or work assignments" would have

one point deducted from his total point score. *Id*. Such a reduction could offset an added

point for negative institutional behavior or an increased risk assessment. *Id*. Under the 2000

Guidelines, in contrast, an inmate must demonstrate "*superior* program achievement (as

determined subjectively by the Hearing Examiners and Commissioners)," which would only

result "in reduction of the offender's total guideline range by 1/3 of the period for which such

achievement [was] demonstrated." *Id*. (emphasis in original).

Finally, whereas the 1987 Regulations, and the 1991 Policy Guideline, established criteria for determining when the D.C. Parole Board could depart from an offender's total point score to deny parole, the 2000 Guidelines are much more open-ended. *Id.* The 2000 Guidelines "treat as 'unusual' any circumstance not already accounted for in the total guideline range, thus substantially enlarging the USPC's discretion to impose a non-guidelines decision." *Id.*

Thus, the facial differences between the 1987 Regulations and the 2000 Guidelines constitute a retroactive change in the law that is sufficient to satisfy the first prong of the *ex post facto* analysis.[3]

Regarding the second prong, Haley argues that Magistrate Judge Carlson erred insofar as he did not find that the USPC's failure to apply the 1987 Regulations constituted an *ex post facto* violation. (Doc. 54 at 5-6). There is no dispute that the 1987 Regulations should have been applied during all of Petitioner's parole hearings. (*See* Doc. 34 at 23:12-24). Had the 1987 Regulations been applied during Haley's first rehearing, on March 21, 2001, his total point score would have been two. (May 10, 2010 Mem., Doc. 11-1, Ex. 16). Under the 1987 Regulations, an inmate with a total point score of two would be presumptively suitable for parole. D.C. Mun. Reg. § 204.21.

---

[3] During Haley's initial hearing, and apparently during his first rehearing, the USPC applied the 1998 Interim Regulations. (*See* Hr'g Summs., Doc. 11-1, Exs. 2, 4). This does not affect the Court's analysis. Clearly, the 1987 Regulations were not applied during these hearings. Although the 1998 Interim Regulations differ from the 2000 Guidelines, the 1998 Interim Regulations contain elements of the 2000 Guidelines that make them more stringent than the 1987 Regulations.

As a result, the record presents more than a "speculative and attenuated possibility," *see Morales*, 514 U.S. at 509, that the USPC's failure to apply the 1987 Regulations during the March 21, 2001 hearing "disadvantaged" Petitioner. *See Richardson*, 423 F.3d at 287-88. Thus, the USPC's failure to apply the 1987 Regulations constituted an *ex post facto* violation. The question therefore becomes what relief was Haley entitled to?

In cases involving challenges to parole decisions, the remedy for an *Ex Post Facto* Clause violation is remand to the parole board to apply the parole laws and regulations that were in effect when the offender committed his crime. *Mickens-Thomas v. Vaughn*, 321 F.3d 374, 393 (3d Cir. 2003); *Farmer v. McVey*, 2011 WL 776210, at *5 (M.D. Pa. 2011) (collecting cases) *aff'd*, 448 F. App'x 178 (3d Cir. 2011). Here, this would entail remand to the USPC to apply the 1987 Regulations. However, as Magistrate Judge Carlson observed, Haley has already received such relief. (Doc. 48 at 18). Following the promulgation of the *Sellmon* Rule, Petitioner received a remedial hearing in 2009, and another in 2010, where the USPC evaluated Haley's parole status under the 1987 Regulations. (Hr'g Summs., Doc. 11-1, Exs. 14, 18). Following his June 22, 2010 hearing, Haley was paroled. (July 27, 2010 Notice of Action, Doc. 11-1, Ex. 18; Certificate of Parole, Doc. 11-1, Ex. 19).

Therefore, Magistrate Judge Carlson correctly found that Petitioner received all of the relief to which he was entitled during the June 22, 2010 hearing. (Doc. 48 at 18). Despite this, Haley argues that he is entitled to further relief in the form of a *nunc pro tunc* parole date effective 2001. (Doc. 56 at 3-4). Petitioner protests that the USPC should have

considered his *nunc pro tunc* request and that the record indicates that it did not do so. (*Id.*).
This assertion is without legal or factual support.

Contrary to Haley's contention, the record reflects that the USPC considered his
request to be paroled *nunc pro tunc* on multiple occasions. During his December 10, 2009
*Sellmon* hearing, Hearing Examiner Pacholski addressed Petitioner's *nunc pro tunc* claim.
(Hr'g Summ., Doc. 11-1, Ex. 14, at 3). Although the Hearing Examiner recommended denial
of parole, he also specifically rejected Haley's request for *nunc pro tunc* relief. (*Id.*). Hearing
Examiner Pacholski wrote that even if he were to recommend parole, he would not have
selected a *nunc pro tunc* parole date, but instead "would have recommended a parole to the
consecutive sentence only." (*Id.*).

Following the December 10, 2009 hearing, Haley's counsel sent the USPC a letter,
dated January 8, 2010, asserting that under the 1987 Regulations he should have been
found to be presumptively suitable for parole. (Doc. 22-6, Ex. 4, at 1). In the letter, Petitioner
also renewed his request for a *nunc pro tunc* parole date. (*Id.*). On January 25, 2010, an
Executive Reviewer reevaluated Hearing Examiner Pacholski's recommendation. (Dec. 10,
2009 Hr'g Summ. at 3-4). The Executive Reviewer stated that the USPC considered the
January 8, 2010 letter but nonetheless "agree[d] with Examiner Pacholski's point score and
his recommendation to deny parole[.]" (*Id.* at 3).

On April 5, 2010, Haley's counsel sent the USPC another letter. (May 10, 2010
Mem., Doc. 11-1, Ex. 16). While the Court was not provided with a copy, a memorandum

produced by the USPC's general counsel indicates that this letter sought to have the USPC reopen Petitioner's case due to a failure to credit him with a one-point reduction for attaining his GED while incarcerated. (*Id.*). The USPC's general counsel determined that Haley's claim had "some merit" and recommended a special reconsideration hearing to determine the ramifications of a possible one-point reduction. (*Id.*). There is nothing in the general counsel's memorandum that indicates that Petitioner's April 5, 2010 letter requested a *nunc pro tunc* parole date or that the USPC granted Haley's request to reopen in order to consider *nunc pro tunc* relief. (*Id.*; May 18, 2010 Notice of Action, 11-1, Ex. 17).

To the contrary, USPC records indicate that the special hearing, held on June 22, 2010, "was limited in scope to discuss the points awarded at the previous hearings." (Hr'g Summ., Doc. 11-1, Ex. 18, at 1). Nothing in the summary of the June 22, 2010 hearing indicates that Haley, or his counsel, argued for *nunc pro tunc* relief. (*See id.*). As a result, the Hearing Examiner did not specifically discuss why a *nunc pro tunc* parole date would be inappropriate. However, she did indirectly address the matter in explaining her rationale for recommending parole effective September 6, 2010, two and a half months after the June 22, 2010 hearing. (*Id.* at 3).

First, the hearing summary makes clear that the Hearing Examiner recommended parole "after the service of 198 months to [begin] the consecutive 145 month sentence." (*Id.*). The Hearing Examiner explained to Haley that he would not be released into the community but instead would be paroled to serve his second sentence. (*Id.*). Second, she

24

stated that this fact entered into her determination that Petitioner was suitable for parole. (*Id.*). She reasoned that his risk to the community would be reduced since "he would still be held accountable for any serious infractions he receives while incarcerated on the 145[-month] sentence." (*Id.*).

After Haley was paroled, the USPC again considered his *nunc pro tunc* request. On September 15, 2011, Petitioner's counsel contacted the USPC requesting that it "either issue a revised Notice of Action and enter a *nunc pro tunc* [parole] date or order a special reconsideration hearing to further consider what the Commission would have done at Mr. Haley's prior hearings had the correct guidelines been applied." (Pet'r's Ex. 5, Doc. 22-7, at 2). The USPC responded in letter dated September 29, 2011. (Pet'r's Ex. 6, Doc. 22-8). It stated that the USPC had received the letter from Haley's counsel and "reviewed the case" but nonetheless "decided not to reopen" Petitioner's case. (*Id.*).

Therefore, Haley's argument that the USPC never considered his *nunc pro tunc* request is factually inaccurate. The USPC considered Petitioner's request on several occasions. Despite this, Petitioner protests that the USPC did not specifically address the possibility of *nunc pro tunc* relief during the June 22, 2010 hearing. (Doc. 54 at 7-8). However, Haley offers no evidence that he, or his counsel, made a request for a *nunc pro tunc* parole date during the June 22, 2010 hearing, or in his April 5, 2010 request to reopen. Further, the USPC specifically rejected Petitioner's request for *nunc pro tunc* relief both before and after the June 22, 2010 hearing.

Moreover, the Court is unaware of any authority that would support Petitioner's assertion that he is entitled to further relief. On April 15, 2014, Magistrate Judge Carlson ordered the parties to file supplemental briefs addressing "whether there is any precedential authority for the *nunc pro tunc* relief that the petitioner urges the Court to grant in this matter." (Doc. 37). In support of his request, Petitioner proffers an unpublished Third Circuit decision, *Traslavina v. Gaines*, 2004 WL 322682 (3d Cir. 2004). (Doc. 43 at 15-16). However, Haley's reliance on *Traslavina* is misplaced. Not only is *Traslavina* distinguishable from the case at bar, it actually supports Magistrate Judge Carlson's finding that Haley has already received all of the relief to which he was entitled.

In *Traslavina*, the petitioner was sentenced to two fifteen-year sentences to run consecutively. *Id.* at *1. The first sentence was parolable, but the second was not. *Id.* The petitioner became eligible for parole after serving one-third of his first sentence. *Id.* After serving two-thirds of the sentence, he was entitled to mandatory parole, absent a serious institutional violation. *Id.*

The petitioner asserted that prison officials told him that he would be released from custody in November 1999. *Id.* Relying on this representation, the petitioner waived his initial parole hearing, which would have occurred in 1994. *Id.* In 1999, prison officials notified the petitioner that he would not be immediately released into the community but would instead be paroled to begin his fifteen-year non-parolable sentence. *Id.*

As a result, the petitioner filed a habeas petition and asserted that his waiver of an initial parole hearing in 1994 was unintelligent. *Id*. at \*2. The petitioner argued that he was entitled to a parole hearing *nunc pro tunc* as of November 18, 1994. *Id*. The Third Circuit agreed and ordered a hearing *nunc pro tunc* to that date. *Id*. at \*3. Although the district court did not reach the merits of the petition, the Third Circuit remanded the matter directly to the USPC to conduct a hearing within thirty days. *Id*. at \*5. The Third Circuit explained that it issued a summary order because it was possible, if the petitioner's claim had merit, that he should have been paroled in 1994 and released immediately. *Id*. In between the Circuit's opinion in *Traslavina* and the summary order, which preceded it, the USPC conducted the *nunc pro tunc* hearing and denied parole as of 1994. *Id*. As a result, the Circuit concluded that the petitioner's request for relief had been satisfied. *Id*.

The key factor that distinguishes the instant action from *Traslavina* is that the petitioner there was unconstitutionally deprived of a parole hearing. The Third Circuit ordered a *nunc pro tunc* hearing to remedy the petitioner's loss of an initial hearing in 1994. Here, in contrast, Haley has already received remedial hearings. As a result, remand is unnecessary, and *Traslavina* provides no basis for finding that Haley is entitled to further relief.

If anything, *Traslavina* supports Magistrate Judge Carlson's finding that Petitioner has already received relief. Following the remedial hearing in *Traslavina*, the Third Circuit stated that the "Parole Board has now conducted that hearing and, based upon their review

27

of plaintiff's record, denied him parole as of 1994. [The petitioner's] request for relief on this claim has therefore been met." 2004 WL 322682, at *5. Likewise, here, Haley has received remedial hearings, the 1987 Regulations were applied, and he was paroled. Petitioner's request for relief has therefore been met.

Because Haley does not cite and the Court is unaware of any authority that would support finding that he is entitled to relief beyond the remedial hearings he has already been afforded, his Petition for Writ of Habeas Corpus must be denied.

## V. Conclusion

For the foregoing reasons, the Petition for Writ of Habeas Corpus (Doc. 1) will be denied. A separate Order follows.


Robert D. Mariani
United States District Judge